## HANKS v. ALEXANDER.
### No. 5187.

Court of Appeal of Louisiana. Second Circuit.

March 2, 1936.

See, also, 154 So. 374.

T. L. Scarborough and C. E. Barham, both of Ruston, for appellant.

Robert J. O'Neal, of Shreveport, for appellee.

TALIAFERRO, Judge.

The subject-matter of this case, as disclosed from the bare allegations of the petition, was considered heretofore by this court in passing on an exception of no cause of action sustained by the lower court. 157 So. 772. In that opinion, the allegations of the petition were paraphrased or reproduced as written to such an extent that the theory of plaintiff's position and the predicate upon which she bases her action against R. C. Alexander, the sole remaining defendant, were clearly revealed. The case was remanded by us for trial on the merits. It is again before us on appeal by plaintiff from a judgment rejecting her demands.

It is necessary for the continuity of this opinion to reiterate all, or nearly all, of the facts and issues discussed by this court when the exception of no cause of action was considered by it. Defendant's answer is in effect a general denial of all the facts alleged, and legal conclusions drawn by plaintiff therefrom, on which she bases her hope to recover.

Plaintiff is the daughter of W. R. Alexander and the youngest sister of defendant, R. C. Alexander. Her mother died on or about June 14, 1924. On January 28, 1927, the father was appointed tutor to her, and R. C. Alexander became her undertutor. W. R. Alexander remarried one month thereafter. He then settled with all of his children for their interest in their mother's estate. Plaintiff's interest therein was converted into cash, amounting to $2,549.80, and on February 1, 1927, the money was deposited on time by the tutor in a bank in Dubach, La., at 4 per cent. interest. The certificate of deposit was annually renewed and the accumulated interest thereon added to the principal. It was last renewed in February, 1932, with the date of maturity fixed one year ahead, being after plaintiff would attain her majority. It was then made payable to plaintiff and was thereafter delivered to her by her father, in order that she could collect same personally when she was legally competent to do so. She sent the certificate to the bank which issued it, for safekeeping. It remained there subject to her disposition until October 5, 1932.

Plaintiff boarded in the home of R. C. Alexander from January 5, 1926, until February 20, 1927. He charged $10 per month therefor, which amount was paid by her father. She then resumed living in her father's home. Thereafter, he and her sisters and brothers became disturbed over the prospects of an early marriage between plaintiff and a stepbrother, and initiated

plans to thwart the consummation of the threatened union. Several members of the family, including R. C. Alexander, met at the father's home in September, 1928, to discuss and decide upon plaintiff's immediate welfare, and it was the unanimous sense of the meeting that she should go to defendant's home to live. Each of her brothers and sisters was willing to take her into their homes, but she preferred to live with defendant. Accordingly, she was taken there. There is a sharp disagreement between the two family factions as to whether defendant was to charge plaintiff board or not. He says he never agreed not to do so. He had charged her father for her board previously and there appears no good reason why he should not have done so again. She continued to live with defendant until she married on May 28, 1932, at which time she was in her twenty-first year. She and her husband then established a home near that of defendant.

The lower court gave a lengthy, written résumé of the facts of the case, with cogent reasons supporting the conclusions reached by it on the issues thereof, from which we quote and adopt the following excerpt:

"At the time plaintiff left her father's home and went to live in the home of defendant, there was no understanding between W. R. Alexander, plaintiff's father and tutor, and R. C. Alexander, as to how or by whom her expenses for food, clothing, education, etc., would be paid. As between them her going to defendant's home was considered only a temporary arrangement. However, the arrangement developed into one of a permanent nature. Plaintiff desired to continue her education. Her father would not assist her financially in going to school, so she and defendant entered into an agreement by virtue of which defendant loaned her money with which to pay these expenses. Plaintiff continued her course in high school and graduated there. She then attended the State Normal College and Louisiana Tech. He loaned her money as she needed it, and at the end of each school term she gave him a note for the amount he had loaned her for that term. During the period extending from September 27, 1928, to April 1, 1932, plaintiff gave defendant a series of eight notes covering the amount he had loaned her and his charges for her board. These notes are described in paragraph 7 of plaintiff's petition. Defendant charged plaintiff $10.00 per month for board for the time she went

to school from his home. During the time she was at home, but not in school, he did not charge her board. In all, he charged her board for twenty months. All of this board was included in the last note given and it was given on the afternoon of the day of plaintiff's marriage, but prior to her marriage. These notes, when plaintiff paid them on October 5, 1932, amounted to the sum of $1175.58. On the latter date plaintiff went with defendant to Dubach State Bank, obtained her time certificate from the Bank, endorsed it, and the Bank paid it, the full amount of which was $2991.80. Out of this amount plaintiff paid her notes and had the balance of her money deposited to her credit.

"Plaintiff's main demand is that defendant, R. C. Alexander, her undertutor, acting in the capacity as such, assumed the duties of her tutor and, in the administration of her property, in said assumed capacity, spent $758.69 over and above the annual returns from her estate without proper authority from the court to do so. She seeks to recover judgment against defendant for this amount, with legal interest from judicial demand.

"She sets forth two alternative demands. The first is that she paid defendant the sum of $1175.58, in settlement of her notes, through error of fact and error of law, and that, for said reason, she should recover said amount, with legal interest from judicial demand. The second alternative is that she should recover the said sum of $1175.58, with legal interest from judicial demand, on the ground of artifice, fraud, and various other wrongs practiced upon her by defendant, causing her to wrongfully pay him said amount.

"On plaintiff's main demand, the question is,—did defendant, R. C. Alexander, her undertutor, in his transactions and dealings with plaintiff, during the period she lived in his home from September, 1928, to May 28, 1932, assume the relationship of a tutor toward her, and during that period perform the duties toward her and her affairs as though he were in fact her tutor?

"The proven facts of the record show on this point that plaintiff went to the home of defendant to live by common agreement of her father, brothers and sisters that she should go there. These members of her family became disturbed over the prospect of her early marriage to a young man who was then living in her

father's home. A family meeting was held at the father's home; the matter was discussed, and the conclusion was reached that the surest way to avert this marriage was for plaintiff to leave home and go live with one of her brothers or sisters. Plaintiff had previously lived in defendant's home and his home was her choice. Plaintiff was then 17 years of age. She went to live in defendant's home with the consent of her brothers and sisters, her tutor, and her own. Plaintiff continued to live in his home for a period of nearly four years with the same agreement and consent, as the record does not show she sought to leave his home or that her father or any other member of her family objected to her treatment or sought to get her away from his home. There is nothing in the record, according to my interpretation of the facts, which shows that defendant exercised any more dominion or control over the person and conduct of plaintiff during that period than any brother should exercise over a minor sister living in his home. Of course, insofar as the care of the person of the minor was concerned, he did very much the same as he would have done in that respect had he been her father and tutor. Being her brother, it was his duty to properly care for her and look after her welfare as he did.

"Defendant never did have the possession or the administration of plaintiff's estate. The money represented by the time certificate of deposit was her estate,—all the property of any kind or description that she owned. W. R. Alexander, her tutor, administered that fund until just a short time, three or four months, before plaintiff married, and was thus emancipated. He kept the certificate in his possession; it was payable to him, until the last time he renewed it just before her majority, and delivered it to her. It was then payable to plaintiff. W. R. Alexander sent it to plaintiff by defendant, but it cannot be said that defendant possessed it on that occasion as or in his capacity as undertutor. The suggestion is nowhere made that he could have used this money in any manner whatsoever, if he had desired to do so, because it is perfectly evident to everyone that he never did have the opportunity to do that. A tutor has the administration of his ward's estate, as well as the care of her person. (C. C. Article 337). Defendant did not have that possession of plaintiff's estate in any sense of the word, and therefore, in that respect,—that is, as the ad-

ministrator of her property, he could not and did not perform the duties toward her and her property as though he were in fact her tutor."

The cases of Eby et al. v. McLain et al., 123 La. 138, 48 So. 772, and of Thacker v. Dunn, 26 La.Ann. 442, relied on by appellant, have application only where it is established that the undertutor has had and exercised complete control and dominion, not only over the person of the ward, but also of her estate. The judge a quo found, and he is abundantly sustained by the testimony in the case, that defendant at no time had in his possession or control the time certificate of deposit, owned by plaintiff, her sole asset. When her tutor delivered it to her, she was the payee thereof. No one could collect it without her indorsement, and she only indorsed it on October 5, 1932, four months subsequent to her marriage, in order to pay defendant what was due him. Therefore, defendant's relation to plaintiff was not as negotiorum gestor in any sense, and her efforts to hold him responsible to her on that basis must fall.

The cashier of the bank calculated the interest due on the certificate and that due on the notes given defendant by plaintiff, and gave defendant credit for the amount due him, at the request of plaintiff. She had full knowledge of the facts of the whole transaction and never complained that she was unjustly treated or that an injustice was done her in that connection until several months had passed.

In this court, the brief of plaintiff's counsel only deals with and discusses her main demand. It is evident that the alternative demands have been abandoned. We find no merit whatever in them. Plaintiff did not act in error of the true facts involved in her dealings with defendant, and especially were the facts of the settlement between them on October 5, 1932, well known to her. No element of fraud, artifice, or unfairness was present. She testified that she had at all times desired to pay her brother all she was due him, but modified this position by saying she thought she had paid him too much. She did not think she should have paid him board.

As a rule, a minor is not bound by contracts executed by him without judicial authority or the consent of his tutor; and it is not every contract entered into by his tutor on his behalf, without judicial sanc-

tion, that is binding on him. There are exceptions to the general rule, however. Article 1785 of the Civil Code, in part, provides:

"When the minor has no tutor or one who neglects to supply him with necessaries for *his support or education,* a contract or quasi contract for providing him with what is necessary for those purposes, is valid. [Italics ours.]

"A minor is also capable of accepting the contract of mandate, under the restrictions and modifications contained in the title on that subject.

"His stipulations in a marriage contract, if made with the consent of those whose authority is in such case required by law, are also valid.

"The obligation arising from an offense or quasi offense, is also binding on the minor.

"In all other cases, the minor is incapacitated from contracting, but his contracts may be rendered valid by ratification, either expressed or implied, in the manner and on the terms stated in this title under the head: Of Nullity or Rescission of Agreements."

Under the title of The Action of Nullity or of Rescission of Agreements, appears article 2228 which, referring to a minor's contract, reads as follows: *"Ratification after Majority.*—He can not make void the engagement which he has subscribed in his minority, when once he has ratified it in his majority, whether that engagement was null in its form, or whether it was only subject to restitution."

To the same effect is article 1875; and article 2272 provides that the voluntary execution of an obligation against which the law admits the action of nullity or rescission, is equivalent to ratification thereof. See Taylor v. Rundell, 2 La.Ann. 367; Wilson v. Craighead, Tutor, 6 Rob. 429; Williams v. Horn, 170 La. 663, 129 So. 122.

Therefore, under the plain letter of article 1785, quoted above, where, as in the present case, the tutor neglects and refuses to supply the ward with the "necessaries for his support or education," a contract entered into between the ward and a third person to provide that which the tutor has refused to provide, is valid; and even if this were not true, in the present case, where it is established beyond any question

that the minor, after attaining her majority and with full knowledge of all the facts, ratified her contracts by voluntarily paying them, she cannot now be heard to impugn the integrity of such.

In conclusion, we will add that the record in this case does not prove defendant to be the vile and untrustworthy character plaintiff would have us believe he is. On the contrary, it reveals him as possessing a brotherly interest in plaintiff's welfare and a willingness to render her every assistance within his ability to attain her ambition to secure a college education. In keeping with this attitude toward her, he not only advanced his own money, but borrowed from others to defray her college expenses. This was done after her own father had declined to do so.

The judgment appealed from is correct, and is hereby affirmed, with costs.